**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION**

| | |
|---|---|
| IN RE: | |
| RICHARD WILLIAMS and | Chapter 12 |
| PAMELA WILLIAMS | Case No. 10-70767 |
| Debtors | Judge Tracey N. Wise |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on a creditors' Motion to Convert this Chapter 12 proceeding to a Chapter 7 proceeding (the "Conversion Motion") for fraud in connection with the case pursuant to 11 U.S.C. § 1208(d) (Doc. 44). The creditors, the heirs of Raymond E. Fontaine (the "Fontaines"), claim that the Debtors, Richard and Pamela Williams (collectively the "Williams"), intentionally and materially misrepresented their assets, liabilities and financial affairs in their bankruptcy proceeding. The Court conducted an evidentiary hearing on the Conversion Motion on March 17, 2011. Testimony was offered from the Williams, Shannon Moler, Jeffrey Derouen, and Robert Carlson. In addition, fifty-one exhibits were admitted, including the 2004 examination testimony of Rachel Thompson. Upon consideration of the parties' testimony and exhibits admitted into evidence, the record, as well as arguments of counsel, the Court finds that as a result of the Williams' fraud in connection with the case as more particularly set forth herein, the Conversion Motion shall be granted. This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law. In reaching the conclusions found herein, the Court has considered all of the evidence, exhibits, and arguments of counsel, regardless of whether or not they are specifically referred to in this decision.

I.

The Williams are involved in several oil, gas, cattle, and farming operations. Among their many assets are ownership interests in several business entities, and large tracts of property located in Magoffin County and Mercer County, Kentucky. The Williams have been involved in litigation the Fontaines since 2008. In an action pending in the United States District Court for the Eastern District of Kentucky, the Fontaines asserted claims against the Williams for breach of contract and fraud, alleging that the Williams and a company owned solely by

1

them, P & J Resources, Inc. ("P & J"), engaged in a scheme to induce Raymond Fontaine as well as certain members of the Fontaine family to enter into transactions and ventures related to oil and gas production (the "District Court Action"). Partial summary judgment was granted in favor of the Fontaines and a status conference for the purpose of scheduling a trial on the remaining issues was set for June 17, 2010 in the district court.

Substantial discovery was performed in the District Court Action, including the depositions of the Williams which were conducted in October and December of 2009. During these depositions, the Williams testified that in addition to their ownership of P & J, Pamela Williams was the sole owner and president of BTU Gas Company, Inc. ("BTU").

The District Court Action was stayed when, on June 11, 2010, P & J filed a Chapter 11 petition (the "P & J Case"). P & J represented in its petition that it was in the business of drilling gas wells and selling gas in Kentucky and West Virginia. Within the first several weeks of the P & J Case, the Fontaines moved for modification of the automatic stay seeking authorization for the District Court Action to proceed to trial. This motion was denied.

In early September 2010, a fire occurred in a building used by P & J and various records were destroyed. As a result, it was discovered that neither P & J nor the Williams as owners of the property had maintained insurance on the premises or its contents. Both the U.S. Trustee and the Fontaines moved to convert the P & J Case to a Chapter 7 proceeding for cause, including the lack of adequate insurance. At no time did the record in the P & J Case reflect that P & J engaged in any business operations postpetition. The P & J Case was converted to a Chapter 7 proceeding by order entered September 30, 2010.

Prior to the conversion of the P & J Case, a 2004 examination of Richard Williams was conducted. During this examination, Richard testified that he had sold his interest in a company called Mid American Natural Gas Organization, LLC ("Mid American") to his brother, Garry, in early 2009. Mid American owns a 25% interest in a pipeline, but Richard stated that he received only one dollar as compensation for this transfer.

In the meantime, the Williams had filed their first Chapter 12 petition on Friday, August 13, 2010 (the "First Chapter 12"), seeking to stay a foreclosure sale of their real property scheduled for the following Monday. Upon finding that the Williams had not received timely credit counseling as required by 11 U.S.C. § 109(h), the Chapter 12 Trustee moved to dismiss the bankruptcy case, which motion was granted by order entered on September 20, 2010.

Ten days later, on September 30, 2010 (the same day that the P & J Case was converted to Chapter 7), the Williams filed their second Chapter 12 petition (the "Second Chapter 12"), this time with the certificate evidencing their now timely obtained credit counseling. The Williams' Second Chapter 12 schedules (the "Second Schedules") set forth several changes from the schedules filed in their dismissed First Chapter 12 (the "First Schedules"). Second Schedule B set forth the following previously omitted information:

1. A 50% interest in High Rock Investments valued at an "unknown" value, and a receivable owed by that firm to the Williams in the amount of $40,000.00;
2. A $15,000.00 receivable due to the Debtors from a tobacco base buyout;
3. Equipment in the possession of Cumberland Valley National Bank ("CVNB") valued at $65,000.00.

In addition, the Second Schedules changed the value of several assets. For example, the First Schedules listed farm equipment valued at $216,000.00. In the Second Schedules, the same equipment was valued at $106,150.00, although neither the amount nor type of property changed in the descriptions from both sets of schedules. Other farming equipment—described as a tractor, a bale wrapper, a front end loader, and spray equipment—had been valued at $166,000.00 in the First Schedules, but the Second Schedules now valued them at $57,500.00. Other changes included decreased values for a 1999 Fleetwood mobile home. The overall effect of the valuation changes to Schedule B resulted in a decrease in the total personal property value of $847,000.00 in the First Schedules to $684,160.00 in the Second Schedules.

Second Schedules D, E and F also contained several significant changes:
1. The debt owed to Brandeis Machinery was changed from fully secured to fully unsecured;
2. The debt owed to CVNB was changed from partially unsecured to fully secured;
3. The debt owed to the Internal Revenue Service was reduced from $150,000.00 to $20,000.00; and
4. A previously undisclosed debt owed to Community Trust Bank in the amount of $70,000.00 was included in Second Schedule F.

On December 8, 2010, the Fontaines filed their Conversion Motion. They claimed that the Williams had misrepresented their assets in their Second Schedules by claiming that they have no income from BTU and by not listing their ownership of BTU. The Fontaines argued that this was done by the Williams in order to conceal BTU from their creditors. The Fontaines further claimed in the Conversion Motion that the Williams had failed to disclose a prepetition

3

transfer of Richard Williams' interest in Mid American to his brother, and misrepresented their ownership interest in the Fontaine-Williams Gas Gathering System, LLC ("Fontaine-Williams LLC"). A preliminary hearing on the Conversion Motion was scheduled by agreement for January 13, 2011.

The day before the hearing, on January 12, 2011, the Williams filed their first amendment to their schedules and statement of financial affairs. Regarding the interest in Mid American that Richard Williams had admitted to transferring in his 2004 examination in the P & J case, the amendment stated in pertinent part:

> Mid American Natural Gas Organization, LLC
>
> Debtors intended to transfer to Garry Williams in early 2009, but said transfer was not completed.
>
> Company's sole asset is a 25% interest in a pipeline (known as the The Big Sandy Line) which cost approximately 2.5 million dollars to construct, but is not being used.
>
> Debtor estimates that this business is worth approximately $100,000.00

(Doc 84, Sch. B-13).

In addition to amending their Schedule B, the Williams amended their statement of financial affairs to disclose their interest in Mid American. This amendment also disclosed for the first time in either the First Chapter 12 or the Second Chapter 12, interests in CDDL, Inc., R&D Drilling & Completion Company, Inc., R&R Energy, LLC, and Williams Brothers Construction, LLC. The amended Second Schedule B stated that CDDL, Inc., a construction debris landfill, provided income of approximately $10,000.00 annually. The amended schedules and statement of financial affairs did not, however, provide any values for the other newly disclosed business interests.

After the first amendment was filed, the Fontaines conducted a Rule 2004 examination of Rachel Thompson ("Rachel"), an adult daughter of the Williams, on January 17, 2011. Rachel testified that her father, Richard, had asked her to receive an air compressor used in the drilling of oil and gas wells in exchange for Rachel's interest in certain cows. After Rachel received the compressor, she was approached by Cross Rock, a drilling company that expressed an interest in purchasing the air compressor. Richard negotiated a sale with Cross Rock on behalf of Rachel, which resulted in proceeds of approximately $90,000.00. A significant portion the sale proceeds were then used to pay bankruptcy counsel for P & J. On February 3, 2011, the Chapter 7 Trustee in the P & J Case commenced an adversary

4

proceeding grounded in allegations of fraudulent transfers to recover the proceeds from the transfer and subsequent sale of the air compressor.

After Rachel's 2004 examination, after the P & J trustee initiated the adversary proceeding, and less than two weeks prior to the evidentiary hearing on the Conversion Motion, the Williams filed a second amendment to their schedules and statement of financial affairs on March 2, 2011. Neither the schedules or statement of financial affairs in the Williams' First Chapter 12, nor those in the Second Chapter 12 had disclosed any interest in BTU. This second amendment disclosed for the first time the Williams' ownership interest in BTU, a $1,400,000.00 asset in which the Williams claimed to hold a 100% interest (which the Fontaines had previously raised in the Conversion Motion). In addition, the second amendment further amended the statement of financial affairs disclosing for the first time the prepetition transfer of the air compressor to Rachel. It stated that the transfer to Rachel took place in February 2010, and that a drilling compressor was exchanged for Rachel's "1/2 interest in a flush cow and two heifers."

In summary, the First Schedules filed in the First Chapter 12 valued the Williams' personal property at $847,000.00. The original Second Schedules filed in the Second Chapter 12 valued their personal property at $684,160.00. After the two amendments to their Second Schedules, their personal property was valued at $2,438,493.00.

II.

The evidentiary hearing on the Conversion Motion was held on March 17, 2011. The testimony at the hearing was directed primarily at the Williams' alleged failures to disclose: (1) prepetition sales of cattle and equipment; (2) transfer and/or ownership of the Mid American interest; (3) transfer of the air compressor to Rachel; (4) their ownership interest in BTU; (5) the accurate source of their income of $3,000.00 per month claimed by them as "help from family members;" (6) their interests in several companies in the original schedules; and (7) their ownership interest accurately in the Fontaine-Williams LLC.

Richard Williams testified that on March 21, 2009, an auction took place on the Williams' Magoffin County property. During this auction, the Williams sold farm equipment that had been used in their farming operations yielding proceeds of $433,865.00. Richard testified that a portion of these proceeds were distributed by the auctioneer to two creditors of the Williams, and a remaining amount of $191,884.04 was distributed to Pamela Williams, and may have

5

been deposited into their farm account. This auction and its resulting proceeds were not disclosed in the Williams' schedules, statement of financial affairs, or any amendments thereto.

During his testimony, Richard Williams stated that he did not believe the auction was outside the ordinary course of business, yet he conceded that his farming operation, Circle J Farms, is not in the business of selling farm equipment. In fact, he claimed the equipment was sold because the coal mining and oil and gas drilling business had shut down in the poor economy, and the Williams could not continue to make the approximately $220,000.00 monthly equipment payment.

The Williams also testified that they auctioned cattle in October and May of 2009 in the Williams' sale barn on their Mercer County property. Richard Williams admitted that they sold 60 head of cattle in the May auction, but claimed he did not know of the amount sold in the October auction. According to Richard, the sales were performed so the Williams could obtain relief from their debt burden. He further claimed that CVNB took all of the sale proceeds from the auctions. Like the equipment auction, the cattle auctions were never disclosed in the Williams' schedules, statement of financial affairs or amendments thereto.

During Pamela Williams' testimony, evidence was presented that the Williams had sold other property during the two years prior to their bankruptcy filing. Pamela admitted that she sold several pieces of equipment prepetition, including a trailer that was sold for $3,000.00 in February 2010, and scrap parts for a dozer that were sold for $25,000.00 in September 2010. Pamela claimed these sales were not included in the Williams' statement of financial affairs because she thought they were "junk". Again, at no time during the Williams' case have these sales been disclosed.

Richard Williams testified that he transferred his interest in Mid American to his brother, Garry, in 2009. According to Richard, Mid American owns a 25% interest in a gas pipeline, and when they filed their schedules, the Williams did not disclose their interest because Richard believed Garry owned it. Richard claimed that after they filed their petition, their bankruptcy counsel told them they could not transfer the interest, so Garry transferred it back (postpetition). Tellingly, this testimony is at odds with the amendment to Schedule B set forth above which stated that the transfer to Garry in early 2009 "was not completed."

Testimony was adduced from Richard Williams regarding the prepetition transfer of the air compressor to his daughter, Rachel. Richard claimed he did not include the transfer in the original schedules because he did not think about it at the time. He further claimed that after the

6

Chapter 7 Trustee in the P & J case commenced the adversary proceeding to recover the sale proceeds from the air compressor, Richard asked his counsel to contact the Chapter 12 Trustee to tell him that it was a trade to his daughter for an interest in a heifer and authorized the filing of the March 2, 2011 amendment to the statement of financial affairs to disclose the transfer.

A majority of the testimony presented at the hearing focused on the Williams' alleged misrepresentations concerning their ownership and/or operation of BTU, their failure to disclose that BTU paid for their personal expenses in the approximate amount of $3,000.00 per month, and their alleged misrepresentations concerning their ownership interest in the Fontaine-Williams LLC.

Richard Williams testified that BTU was formed in 1994, and currently provides services to approximately 520 residential customers. He further testified that at the time of BTU's formation, Pamela Williams was the sole shareholder of the corporation. According to the Williams, BTU's records were destroyed in a flood in 2004. Following the flood, they claim they transferred BTU's stock to Richard's daughter, Shannon Moler. According to Richard, their reason was that "[w]e thought if we put the stock in Shannon's name as a kind of like a will, she, all she would do if something happened to us is pick it up and continue on." The Minutes of a BTU shareholder meeting held on March 17, 2005 state that Pamela Williams was the original shareholder, and that she transferred all of BTU's shares to Shannon Moler. Pamela testified that she has always been president of BTU, and that she had testified before the Kentucky Public Service Commission in May or June of 2010 on behalf of BTU, and when doing so she believed she was the owner of BTU. An order from the Commission dated September 23, 2010, concerning various violations by BTU also identifies Pamela as the president and sole owner of BTU. In a petition to revise a penalty payment schedule levied by the Public Service Commission against BTU and the Williams, counsel for the Williams stated that the Williams owned BTU. Furthermore, BTU's annual reports and corporate tax returns from 2003-2007 identify Pamela as the owner and president, and do not identify Shannon Moler as a shareholder. Pamela testified that when she signed the annual reports, she believed she was the owner of BTU.

The Court admitted into evidence the affidavit of Jeff Derouen, the Executive Director of the Public Service Commission of Kentucky. He certified that each annual report filed by BTU since 2001 identified Pamela Williams as the sole owner of BTU, that no application has been filed for the transfer of ownership or control of BTU, and that no such transfer has been authorized by the Commission.

7

The Court also admitted the March 11, 2011, deposition testimony of Shannon Moler, the alleged record owner of BTU according to the Williams' testimony. Shannon's deposition testimony stated that she believed that the Williams controlled the operation of BTU, and that she had no firsthand knowledge of its assets. She maintained that she had never served as an officer or employee of BTU, never received any income or distribution of any money or other assets from BTU, and that she did not remember attending any meeting of the board of directors or taking any action as a director. She also stated that she has no direct evidence that she currently or ever owned any stock in BTU, although she has been informed that she was an owner. She further claimed to have never represented to any state or federal agency, office, or authority that she was the owner of stock in BTU.

In her deposition, Shannon claimed that the signature on the articles of incorporation was her own, but that she had no recollection of having signed the document. She also stated that she received copies of the proxy form which she was asked to sign and return to the Williams, which she did each time, although she did not understand the documents or their purpose. She testified that signatures on the addendum to the minutes of BTU, which were incorporated to the minutes of the March 17, 2005, meeting, appeared to be genuine, as well as the signatures on the proxy forms and stock certificate. She did not, however, remember how long she had been signing the proxy forms. Lastly, Shannon asserted she did not believe that her signatures on two of the annual reports were genuine. The first signature was from the annual report dated July 6, 1995. The second signature was dated June 24, 1996.

During the hearing, both Pamela and Richard testified that on the date they filed their Second Chapter 12, they believed Shannon owned the stock, but that they owned BTU. Both claimed that it was not until their bankruptcy counsel advised them that stock ownership equated to company ownership that they realized that Shannon actually owned BTU and that this explained the initial omission of the company from their bankruptcy schedules. Richard Williams testified: "Nobody ever asked us who owned the stock until Ross [the Williams' bankruptcy counsel] did. We never thought about it. It was our daughter. It was our company. We were running it, and Ross said 'Who owns the stock?'" Richard testified that he had replied "Shannon does." Pamela Williams testified that "when it was brought to my attention that the stock being in Shannon's name actually meant that Shannon owned the gas company" she contacted Shannon in early 2011 "and explained to her what was going on and she agreed to sign the stock over because she wasn't involved in it anyway—as far as the running of it." Pamela claimed that Shannon signed the stock certificate transferring ownership in January

8

2011.  However, Shannon Moler's deposition testimony states that she does not remember signing the stock certificate.

This testimony directly conflicted with prior testimony of the Williams submitted via affidavit on March 9, 2011 (Doc. 128).  The Williams' affidavit stated that Shannon owned BTU from the date of its incorporation in 1994 until early in 2011 and did not state that the Williams transferred the stock to her after the flood in 2005.

In addition to the issue of the ownership of BTU, the Williams' testimony addressed the approximately $3,000.00 per month income they listed on their Schedule I as "Help from family members."  Pamela conceded that this income actually came from BTU.  Pamela testified that she controls BTU's checkbook, and that she writes checks to pay for some utilities that are in her name for the Magoffin County property, where BTU's offices and the Williams' residence are located.  According to Pamela, some of the bills are in the Williams' names, and they have been using BTU's funds to pay these personal expenses off and on for three to five years, although nothing in the BTU minutes states that the Williams could repay personal expenses with BTU funds.  The Williams' statement of financial affairs does not disclose any payments from BTU as income or otherwise.  Pamela testified that they are not listed because she did not consider the BTU payments "income" for purposes of the statement of financial affairs.  She further testified that postpetition, in January of 2011, the Williams altered their practice of using BTU funds to pay their expenses.  Currently, they draw money from BTU as income, and use that income to pay their expenses.  No amendments regarding the utility payments or the income taken from BTU were ever made to Schedule I or the statement of financial affairs.

Lastly, the Williams' testimony also addressed their ownership interest in the Fontaine-Williams LLC.  Pamela Williams was originally the president of the LLC, but was removed in December of 2009 and replaced by Robert Carlson, a son-in-law of Raymond Fontaine.  Robert Carlson testified that he caused the LLC to be reinstated into good standing with the secretary of state, obtained the necessary permits for the pipeline, and filed taxes for the LLC, which he claimed had not been paid since 2006.

In their Second Schedules, the Williams claim ownership of 50% of the Fontaine-Williams LLC.  The Fontaines, however, contend that pursuant to the LLC's operating agreement, the Williams only own a 25% interest until the $1,000,000.00 Raymond Fontaine invested in the enterprise is repaid from the gas royalties.  After this repayment, the Fontaines maintain that the Williams interest then increases to 50%.  Robert Carlson testified that the

9

Williams own a 50% equity interest now, but only a 25% membership interest until the $1,000,000.00 is repaid. In his rebuttal testimony, Richard Williams disagreed with Robert Carlson. Richard claimed that the Williams hold a 25% revenue interest, and a 50% membership interest in the LLC. He testified:

> Whenever we first started the pipeline—laying the pipeline—Mr. Fontaine put in a million-and-a-half dollars and I put in $500,000.00 cash and furnished all the right-of-ways and all the equipment to lay the pipe and put the pipe in the ground.
> . . .
> He was to recover $1,000,000.00 dollars of his money which is in the LLC, and at that point we reverted back in for 50/50 ownership. We owned it. Everybody's got it confused. It's a 75% revenue interest, and that means that 25% is of it is revenue. The 50/50 is still the same; you still own it.

At the conclusion of the hearing, the Court took this matter under submission for the determination of whether the Williams' Chapter 12 case should be converted to Chapter 7.

III.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b), it is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O), and venue is proper pursuant to 28 U.S.C. § 1409.

Traditionally, family farmers are granted the highest level of protection and defense under the Bankruptcy Code.[1] *In re Nichols*, 447 B.R. 97, 107 (Bankr. N.D.N.Y. 2010). This protection gives farmers a greater chance to reorganize by limiting the control of creditors in a Chapter 12 case. *Id.* As such, § 1208(d) provides the only means available under the Code for a creditor to involuntarily liquidate a family farmer:

> On request of a party in interest, and after notice and a hearing, the court may dismiss a case under this chapter or convert a case under this chapter to a case under chapter 7 of this title upon a showing that the debtor has committed fraud in connection with the case.

11 U.S.C. § 1208(d). Involuntary liquidation is therefore only permitted upon a showing that a Chapter 12 debtor has committed fraud in connection with the case. Under § 1208(d), the heightened protections granted to family farmers must yield to a finding of fraud because bankruptcy laws "have always had as their intent the protection and/or rehabilitation of honest debtors. They are not and have not been intended to shield those parties who have attempted

---

[1] The Fontaines' Motion to Convert argues that the Williams are not eligible for Chapter 12 relief because they do not qualify as family farmers. However, no proof was developed to support this contention, and it was not pursued by the Fontaines at the evidentiary hearing.

to hinder, delay, or defraud their creditors." *In re Graven*, 101 B.R. 109, 112 (Bankr. W.D. Mo. 1989). Conversions of Chapter 12 proceedings are uniformly recognized as an extraordinary remedy, as "only the very few debtors who refuse to cooperate, are not forthcoming, and who evidence not only bad faith, but dishonest conduct, will be denied the opportunity to reorganize." *In re Bair*, 2002 Bankr.LEXIS 1895, at *22 (Bankr. D. Ka. Feb. 1, 2002). A finding of fraud in bankruptcy is a highly factual matter. *In re Kloubec,* 268 B.R. 173, 176 (N.D. Iowa 2001).

The burden of proof is on the Fontaines to prove fraud in connection with the case. The caselaw is not uniform concerning the standard of proof—some cases suggest that fraud must be proven by "clear and convincing" evidence. *See e.g., In re Caldwell*, 101 B.R. 728, 735 (Bankr. D. Utah 1989). Many of these cases preceded the United States Supreme Court's decision in *Grogan v. Garner*, 498 U.S. 279 (1991), in which the Court held that the applicable standard of proof for exception to discharge claims based on fraud under § 523 is by a preponderance of the evidence. *Id.* at 289. The Sixth Circuit has similarly held that the preponderance of the evidence standard applies to § 727 actions based on fraud. *Barclays/American Business Credit, Inc. v. Adams (In re Adams)*, 31 F.3d 389 (6th Cir. 1994) ("We believe the Supreme Court's reasoning in *Grogan* is equally applicable to Section 523(a) and 727 of the Bankruptcy Code. Accordingly, we join our sister circuits in holding that the exceptions to dischargeability under Section 727, including the exception for fraud, require proof by a preponderance of the evidence."). The Sixth Circuit has not, however, squarely addressed the issue of what standard of proof must be met for conversion under § 1208(d). It is unnecessary for the Court to determine this issue, as the Court finds that the Fontaines have satisfied the stricter clear and convincing standard.

IV.

The intentional misrepresentation of assets and liabilities in bankruptcy schedules constitutes fraud in connection with the case under § 1208(d). *In re Williamson*, 414 B.R. 886, 892 (Bankr. S.D. Ga. 2008); *In re Caldwell*, 101 B.R. at 738. The phrase "fraud in connection with the case" found in § 1208(d) is nearly identical to the phrase "fraudulently, in or in connection with the case" found in § 727(a)(4). "An accepted principal of statutory construction holds that unless the text indicates otherwise, words or phrases which have one interpretation in one provision will have the same interpretation when used in another provision." *Agribank, FCB v. Kingsley (In re Kingsley)*, 162 B.R. 249, 254 (Bankr. W.D. Mo. 1994). Accordingly, because the "fraud in connection with the case" language in § 727(a)(4) is nearly identical to that contained in § 1208(d), it is proper to consider case law interpreting §727(a)(4) when analyzing

11

§ 1208(d). *Accord In re Kingsley*, 162 B.R. at 254 ("[A] finding that the intentional misrepresentation of assets and liabilities on the bankruptcy schedules and at the section 341 Meeting of Creditors constitutes fraud in connection with the case under section 1208(d), is equivalent to fraudulently misrepresenting assets and liabilities on bankruptcy schedules and at the section 341 Meeting of Creditors under section 727(a)(4)(A).").

The Sixth Circuit has held that "[c]ourts may deduce fraudulent intent from all of the facts and circumstances of a case." *In re Kenney*, 227 F.3d 679, 685 (6th Cir. 2000). Accordingly, the Court finds that the Williams' overall course of conduct in their two Chapter 12 cases, as well as the sheer number of omissions in each case, clearly establishes that they have committed fraud in connection with their Chapter 12 case. *Clark v. Reed (In re Reed)*, 293 B.R. 65, 70-71 (Bankr. D. Kan. 2003) (fraudulent intent may be based upon a debtor's course of conduct, or upon the number of omissions in the debtor's filings).

The Williams' course of conduct has established a pattern of not disclosing significant assets and transfers until the existence of the assets or transfers has been raised by another party. Under the facts and circumstances of this case, such conduct is indicative of a fraudulent intent. *See Id.* (a debtor's failure to voluntarily disclose omissions before the trustee raised questions about them and his failure to amend or correct his schedules created a reasonable inference of fraudulent intent). The Williams did not disclose the prepetition transfer of the air compressor to their daughter, Rachel, until the Chapter 7 Trustee in the P & J case commenced an adversary proceeding to recover approximately $90,000.00 in sale proceeds. They did not disclose Richard Williams' prepetition transfer of his interest in Mid American to his brother (an asset valued by the Williams at $100,000.00) until the Fontaines raised the issue of the transfer in their Motion to Convert. Similarly, the Williams did not disclose their involvement in BTU until the Fontaines raised it as an issue in their Conversion Motion.

The Williams' fraudulent course of conduct is also demonstrated by the significant discrepancies between the schedules in the First Chapter 12, the Second Chapter 12 and two amendments. The inquiries and probing by the Fontaines caused the Williams to disclose assets valued at $2.4 million dollars—more than three times their original disclosures. These substantial differences demonstrate that the Williams have engaged in a pattern of behavior extending back to their First Chapter 12 to hide assets, transactions or the values involved. *See In re Caldwell*, 101 B.R. at 735 (noting that the court may look to the debtor's course of conduct both before and after the filing of the case).

Moreover, the significant number of omissions by the Williams also demonstrates the Williams' fraudulent intent. *See In re Reed*, 293 B.R. at 70-71 ("[T]he court concludes that the number of known omissions—here, three—also supports a finding of fraudulent intent."). In addition to their failure to disclose the prepetition transfers of the air compressor and Mid American, as well as their income from BTU, the Williams also never disclosed the sale of farm equipment that yielded almost half a million dollars for their benefit, the sale of approximately sixty head of cattle in October and May of 2009, and other equipment sold prepetition, including scrap parts for a dozer that yielded $25,000.00. Each sale was within two years of their Second Chapter 12 and was required to be disclosed in their Statement of Financial Affairs. Regarding the latter miscellaneous equipment sales, while the Williams have attempted to explain that such sales were not included because they thought they were just selling junk or that they did not think about the sales, it is not for the Williams to decide which assets or prepetition sales to disclose. All debtors have an absolute duty to reveal all of their property interests and transfers, even those the debtor may believe are inconsequential. *In re Bailey*, 147 B.R. 157, 163 (Bankr. N.D. Ill. 1992); *see also Matter of Yonikus*, 974 F.2d 901, 904 (7th Cir. 1992) ("Debtors have an absolute duty to report whatever interests they hold in property, even if they believe their assets are worthless or unavailable to the bankruptcy estate.").

While the Williams have attempted to explain the omission of BTU by claiming they did not understand that they did not own the company until their counsel apprised them of that fact, this does not address or excuse their failure to disclose that Pamela operated BTU as its President, or that BTU paid their personal expenses. Here, the only advice of counsel upon which the Williams purport to rely is advice on not claiming ownership of BTU. Reliance on advice of counsel is only a defense to an omission of assets if a debtor has explained all pertinent facts to counsel and the debtor's reliance on counsel's advice is reasonable and in good faith. *See Schott v. Dupre (In re Dupre)*, No. 02-10010, 02-1022, 2002 WL 32817301 (Bankr. M.D. La. 2002) (holding that the debtor's reliance on advice of counsel was a defense to an omission because the debtor had previously pointed out the omission, which counsel failed to correct). Accordingly, the Williams' attempts to rely on the mistakes or advice of their counsel to excuse the material inaccuracies and omissions in their petitions are without merit. They testified that they reviewed the petition and amendments and did not see any problems with them before signing.

The Williams' explanations for the material omissions are neither credible nor justified. Their testimony is brilliant in their professed ignorance but is belied by the magnitude of the

13

transactions in which they engaged and the detail they pay to technical legalities when it suits their purpose. One example of this is their professed ignorance that stock ownership equates to ownership of the business despite Richard Williams' ability to be most articulate about the distinction between a revenue interest and ownership interest in the Fontaine-Williams LLC.

The Williams' conduct in this Second Chapter 12, as well as the First Chapter 12 and the P & J Case, has been reactive and strategic. Their explanations for their material omissions in their schedules and statement of financial affairs as well as the amendments and corrections thereto are not credible. In each instance, the Williams have not been forthcoming regarding their financial affairs, assets and liabilities. They have created so many spurious explanations that they can no longer provide credible explanations for the totality of their financial circumstances. Simply stated, they cannot keep their story straight. Such is the case regarding the issue of who own BTU's stock. To support their initial omission of BTU as an asset, they claim their daughter is the record owner, but they are not consistent in that claim, as evidenced by the Williams' affidavit which stated that Shannon Moler owned the stock ever since BTU's inception. The Williams testimony claimed that Pamela Williams owned the stock from its inception in 1994 until 2005, when it was transferred to Shannon Moler.

The facts and circumstances of the Williams' case demonstrate a substantial lack of forthrightness with their creditors and with the Court. Disclosure is necessary in the Chapter 12 process, as "[c]reditors must have reliable information to use in assessing their course of conduct to protect their rights in [a] reorganization." *In re Caldwell*, 101 B.R. at 738. Here, after two cases, two amendments, and numerous discovery depositions, the Williams still have not been forthcoming regarding their interests in or transfers of assets of substantial value. Even now, the Williams have not sought to amend their schedules to disclose the income they are receiving from BTU, or to amend their statement of financial affairs to disclose the prepetition sales of equipment and cattle. The failure to amend promptly once the omission is discovered is "an indicia of fraudulent intent." *Id.* at 739; *see also Friedman v. Alfonso (In re Alfonso)*, 94 B.R. 777, 778 (Bankr. S.D. Fla. 1988) ("[A] debtor's failure to promptly amend the schedules is considered a reckless indifference to the truth which is the equivalent of fraud.").

The reorganization process provided by Chapter 12 of the Bankruptcy Code requires full and complete disclosure by all debtors. Neither the bankruptcy court, the Chapter 12 Trustee, nor the creditors should have to rely on parties other than the debtor to disclose assets and prepetition transfers. *In re Martin*, 141 B.R. 986, 997 (Bankr. N.D. Ill. 1992) ("Bankruptcy Trustees lack the time and resources to play detective and uncover all the assets and

14

transactions of their debtors."); *see also In re Caldwell*, 101 B.R. at 738 ("The damage section 1208(d) attempts to proscribe is not limited to damage to a specific creditor, but also encompasses damage to the bankruptcy process.  The damage in this case is the inability of the court, the Standing Trustee and the creditors to rely upon the accuracy of [the debtor's] schedules.").  This Court will not permit the Williams to pervert the purposes of the reorganization process by their efforts to pick and choose what they disclose, and to only disclose certain information after it has been brought to light by other parties.

V.

For the foregoing reasons, the Court finds that the Williams have committed fraud in connection with their Chapter 12 case.  It is hereby ORDERED that the Fontaines' Motion to Convert is GRANTED, and the Williams Chapter 12 case is converted to Chapter 7 pursuant to 11 U.S.C. § 1208(d).

Copies to:

Ross E. Murray, Esq.
Mary L. Fullington, Esq.
Michael E. Litzinger
James R. Westenhoefer
Debtors

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
**The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.**



**Signed By:**
*Tracey N. Wise*
**Bankruptcy Judge
Dated: Wednesday, June 01, 2011
(tnw)**